Judge Pryor, Judge Newsom, and I want to welcome you to the third day of our panel sitting here in Atlanta. Hopefully you're all familiar with the lighting system. If the yellow light goes on, please understand that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, don't worry about it, just keep on going. And with that, we will begin with our first case, number 23-13765, Consolidated with 23-14222 and 24-10524, United States v. Philip Flores, et al. Ms. Weil. Good morning. May it please the Court, my name is Amy Weil and I represent Alan Carson. The issues raised by Mr. Carson on appeal all revolve around a single theme, and that is that Mr. Carson did not receive a fair trial. First, he never should have been forced to defend himself at trial after the prosecutor had dumped what was described as 6.5 gigabytes of documents on him mid-trial. It was after the jury had been sworn and before opening statements had begun. All the factors that determine what an appropriate sanction would be weigh heavily against the government. First— Right, after defense counsel said, wait a second, they asked for a dismissal of the indictment, said we have so much stuff, we can't even upload it, it's in relativity. And so it took them at least one of the defense counsel, almost an entire day, just to upload it. We can't review all this stuff. We're trying to get ready for trial. Mr. Carson paid us for trial. The time it would have taken us to read all this, we don't know when we could get this trial back together. And one of our arguments on appeal, you know, you have to get everybody back together. To give them enough time to be able to review what was described as, at one point, 100,000 documents, 44,000 emails, they said at the time, we can't do this to the judge. And then we've argued in our brief— Did they, at the time, ask for any alternative relief? Like if you're not going to dismiss the indictment, you've got to give us two weeks, three weeks, a month to do this? They did not know how long it would take them. But what they did know is they had been paid for the trial then. And that they were put at a disadvantage then. They knew they couldn't just take a couple days to review it, because that was what the judge was saying. We want to keep this jury together. So I thought I read somewhere, though, that like sort of, maybe it was the backup to the backup to the backup to the backup, they said two-day continuance, that's a fair, you know, sort of balance of competing interests. Sort of. I mean, after they had been told, you're going to go to trial now with this jury now, and after they'd made it clear that they couldn't put it off into the eternity of when they finished doing it, they said, well, first give us a day to see where we are. So it took them a day to upload it. Then they said, well, give us another day to see how much we can review. And they said, there was really little after that about how much they did review. We know they didn't finish it. By the end of trial, they moved again for dismissal. We know now that it never got finished. We also know that the government never finished reading it either. I mean, you physically cannot go through that many documents. Maybe I misunderstood the record, but I thought they said, no, we want to continue with the trial because of the cost. No, they didn't want a continuance because continuance would have meant for them starting the trial back over again, reviewing all the documents and starting the trial over again. And they'd been paid for this trial. They were ready for that trial. So no, they didn't ask for a continuance. Mr. Carson's business was closed. It was shuttered. He couldn't work. He'd been essentially effectively debarred. He paid for this trial. He obviously did not want to go. They said, the way she put it to the judge was, he's been laid off from his job at Invisicom. It's no longer in existence. He does not have the resources to take on what might be six PST files electronically and then continue to pay for his defense and wait, I don't even know how long, for another trial date. We've been pushing our speedy trial rights since he was arraigned and asked for the earliest date. And it's well documented that with the prosecution that we asked for the first date possible, we asked for November 2022. Just to get these lawyers and the judge together, it took them until March 2023. And it would have been, I submit to the court, virtually impossible. When was the case indicted? It was indicted, I think, in 2022. Right. How early in 2020? You don't recall. I don't. I don't have that right. That's okay. You can let me know later. I'm sorry about that. I can let you know. I don't know exactly when it was indicted. They were pushing up on their speedy trial. They wanted to have it done. So how many documents or emails were in this so-called dump of information? At one point, somebody said toward the end, 44,000 or a little over 44,000. At the time, and it was also, let me point out, coming in dribs and drabs. It didn't all come out before they were asked, how much time is it going to take you? There was a point in time where the judge said to them, sent them an email before the trial had begun, after the jury was sworn, saying to the prosecutor, make sure that you let us know whether you've given us all the Brady. Well, instead of discussing Brady in three consecutive, four, excuse me, consecutive emails, starting on that Thursday at 12.58 p.m., so in the afternoon, counsel, we've uploaded some potentially relevant documents. So they're getting documents that they're being told are relevant on Thursday. The jury was sworn on Monday. Then at 2.53, counsel, we've loaded another zip of documents from the PST files that the defense may consider to be relevant. That was the second one. The third one came at 9.42 p.m. that Thursday. Counsel attaches another zip of documents from the PST file, never told this is Brady, and never said, and then there was a fourth one on Friday. That's Friday morning when the trial is supposed to start after the judge said, you know, we're going with this jury. At 9.07, which was minutes before the trial started at 9.34, counsel, we've uploaded a fourth set of documents of PST files. This is not how trials are supposed to work. You're supposed to get discovery not during trial, not in dribs and drabs during trial, which is worse. You're supposed to get it beforehand so that you can review it. And you don't see a lot of cases where this happens. I have looked for cases where it doesn't happen because it's either prosecutors give discovery in advance, or if a judge will throw out the case, or the prosecutor will dismiss it. It just doesn't happen because this isn't the way trials are supposed to go. Hey, can we talk about the prejudice side of the equation? Yes, Your Honor. So, for example, in a hypothetical case, if every single one of these 44,000 or so documents or emails said that, you know, in October of 2022, the sky was gray, it'd be hard to show prejudice, at least as a general matter. So why was there prejudice here from, assume there was error, and that the prosecution did something it wasn't supposed to do? So let's talk prejudice. Well, first of all, the prejudice to the defense in trying to try their case just without what was in the documents, just trying to try it, is overwhelming. You're, instead of looking at witnesses, trying to get your cross together, trying to get your opening statement, this is all before opening statements, they're in a panic. This is chaos. They're trying to upload documents and trying to read them. They're not doing their case. In fact, I submit, Your Honor, through the whole process, it's reasonable to assume that instead of getting witness cross-examinations ready, they're still reading documents. No, I know about that inherent prejudice. I'm asking for more targeted discussion of prejudice, like what was there in the documents that were turned over late that might have changed things, that might have affected defense strategy, that might have led to exculpatory information, the way you would have cross-examined the witness, something that contradicted a government theory, something like that. We're at a loss, Your Honor, to show what was in all the documents. They still haven't been reviewed. The trial went on. Trial counsel wasn't paid to and didn't, after trial was over, review them. The case then went on appeal. Mr. Carson has tried to review them himself. Every single one of the documents were sent in PDF files. So Mr. Carson tried to go into the PDF files and pull them up. I think what I have in my brief is something like 10,000 emails he reviewed. He hasn't finished. But I mean, I guess even in that partial review to Judge Jordan's question, prejudice is sort of part of the analysis. It's part of the legal analysis. So like you and your team must have been thinking, like, what are we going to say when asked the question that Judge Jordan just asked you? And in the partial review of the 10,000, is there anything that's responsive to Judge Jordan's question? No, Your Honor, and we did think about that. And the cost of an appeal, the cost of reviewing all the documents, and the ability to do that, the time to do that. And part of our argument also is the government, who had six years to investigate this case, who had documents months and months and months, who has, I don't know how many million people working for it, they didn't look for Brady. And that's one of my arguments, Your Honor, is that I believe, that we believe, that that is an obligation of the government to look for Brady. How do you say that there is a Brady obligation without saying, you got to look for what's in your possession? I'm not saying go out and search. Yeah, I mean, I guess that's true. But like Brady doesn't set up a like per se rule. It like sets up an analysis, one piece of which is, you know, sort of materiality, prejudice, things like this, that require some understanding of the effect of the nondisclosure, right? It's not just like a strict liability nondisclosure regime. I agree with you, Your Honor, that Brady has an aspect of it. If you go to show, this document's a Brady violation. You have to show prejudice. How's it a Brady? What does it do to, what would it have done? How would things have been different to the defense? Totally agree with that. That's not really what this case is. What this case is, the government dropping all these documents on the defense when they're trying to try the case and go, you got to look for Brady. I don't know if there's Brady in it. We didn't look. Never. I'm never anywhere in the record they ever say, we did a review. They didn't. And they couldn't have. Nobody could have. In the time of the verdict. On the other hand, you know, we've said numerous times that when there's error, whether it's constitutional or non-constitutional, and it's been preserved, the burden is on the government to show that the error was harmless. So maybe the shoe's on the other foot to some degree. Absolutely, Your Honor. And not only does the government not, they're trying to shift the burden of looking for Brady on the defense, which that is not the defense. It's not their obligation. Not their mid-trial obligation. And Your Honor, there is no way, even if that could have been conceivably an option to postpone the trial. I'm here to tell you, Your Honor, it's impossible. If it took, I think, six months to get just the judge and the lawyers together, you've got to get back together these 16 jurors. Because you have to have the alternates and the 12 jurors. You have to have the same people. And virtually impossible. The government created the chaos. It never should have happened. It did happen. And the fact of it happening prejudiced Mr. Carson's right to a fair trial. All right, thank you very much. Okay, Mr. Lothar. Good morning, Your Honors. My name is Joshua Lothar and I represent Valerie Hayes and Philip Flores. The trial court respectfully made error in denying Hayes and Flores' motions to dismiss count one of the indictment based on the statute of limitations violation. Count one, as the court's aware, charges conspiracy to defraud the United States in violation of 18 United States Code Section 371. The statute of limitations relative to that charge is five years. And that references 3282. Hayes and Flores both entered into tolling agreements, separate, of course, with the government, which were limited to, quote, antitrust violations and related violations of federal law with respect to United States government contracting. Count one, in this case, would not- You've got language in that tolling agreement that helps you. And I think language that hurts you. So the language you just quoted supports your position. But you also have language that says, in paragraph five, the time period between September 23rd, 2021 and September 23rd, 2022, shall be excluded from any calculation or computation of time and shall be told for the purpose of the statute of limitations period, which is or might be applicable to any criminal charge. So how do we read those two things in tandem? Agreed. Our submission, however, is that paragraph three, from which I just quoted, was the recitation of the intent of the parties in that agreement. That is the operative language based on, number one, the placement in the contract and number two, the tolling agreement, which is obviously the contract. And number two, the specific recitation of what this investigation entailed. So when you talk criminal antitrust violations and related violations, obviously the antitrust violations control. The other language, which I acknowledge later in that contract, addresses more about the tolling period. So I would say that paragraph three is the one that describes exactly what the intent of the parties were when they entered into that agreement. Why is it, let's assume you're right about both of the clauses and the way they read and the way they interact. Why aren't the charges here in count one related violations of federal law compared to antitrust violations? Black's Law Dictionary defines antitrust as the body of law designed to protect trade and commerce from restraints, monopolies, price fixing, and price discrimination. So isn't the charge in count one related to that sort of violation? Isn't that sort of a charge? I would say it's not, Your Honor. So the Supreme Court has held it's axiomatic, and this is a quote, it's axiomatic that the antitrust laws were passed for the protection of competition. Exactly what the point that you just made. The Fifth Circuit declined to find an antitrust violation where the contracts were sole-sourced. All of the contracts at issue in this case, and I understand we're not talking about counts two and three under 1031, but on count one, all of the contracts were sole-sourced, firm, fixed price contracts, which under 8A, they're non-competitive. So I would say that the antitrust, or any antitrust violation— They're not competitive against other players in the market, but they are competitive in a way. You do have to show the other prices to make sure that the price the government is agreeing to with the sole source reflects market rates, right? So it's not like you can submit your amount and the government's going to take it at face value. You have to do a little— The government has to do a little more to make sure that that's within the range of market pricing, right? I agree, but I also agree, and I would refer the Court to the Ninth Circuit, which specifically held, albeit a civil matter, is sole-source 8A contracts don't run afoul of antitrust laws. And in that particular case, Security Fire Door Company, which I quoted, it dismissed the plaintiff's claim on that. So I understand that's not the Eleventh Circuit. I understand that's a civil case, but I believe it addresses the issue directly. And again, these contracts, these tolling agreements, which are contracts, should be strictly construed against the drafter. That's the DOJ Antitrust Division drafted that. Perhaps it was a form. Perhaps antitrust violations were— that was the understanding that the Antitrust Division had that it would investigate prospectively, but it ended up not being because all of these— because these contracts were less than $4 million, they were sole-source non-competitive. Brian, thank you very much. Thank you, Your Honor. Okay. Mr. Strand. May it please the Court, Stratton Strand, on behalf of the government. The case was indicted in May 2022. All right, can I ask you before you— and then I won't interrupt you as you go into your argument— can you tell me how many documents, emails, were in that provision of documents during that first week of trial? How many were in that trove? From the record, it appears that the documents of concern were the 44,000 emails in the Cook email account. Okay, so that number is correct. It's 44,000. The number's correct, Your Honor. Okay. If I could, I'd like to focus my attention on the late disclosure claim, the statute of limitations claim, and save some time for our sentencing appeal. I'd like to correct some of the factual assertions. What happened here was regrettable, of course, and I should start with that. This was a mistake. The government thought that it had turned this information over. It hadn't. As soon as it discovered that it had not turned it over, it immediately brought the matter to the attention of the Court and the defendants and worked with the Court and the defendants to try to cure any prejudice. But the suggestion that this was a dump of discovery is incorrect. The reason that there were six PST files provided to the defense was because we realized that some of these documents we had intended to turn over and that we hadn't, and we informed the Court these are the six email boxes that we thought had been uploaded that hadn't. The government proposed a targeted production. It said, look, Agent Coleman has pulled out 462 of these emails that she thought were of relevance to her investigation. Perhaps we could start by producing those 462 documents. Seems as if those would be the ones that would be most likely to have relevant information. Defense counsel declined that suggestion. They specifically said that what they wanted was one thing that we are going to need, and what's very important with the PST files is the metadata that accompanies each, and the Court confirmed, all right, so what you've asked for is the PDFs and the native files, and the defendants said yes. So the government proposed a targeted production of relevant information. The defense said no. But that can't work. You're asking them to accept you doing their work for them, so you choose what's relevant from the government perspective. What's relevant to you may not be as relevant to them. I completely agree, Your Honor. The only thing I'm trying to clarify is that this was not a discovery dump. Yes, it was. 44,000 documents, which you've confirmed. Your Honor. After trial, hold on. Yeah, of course. I'll let you get back at me. 44,000 documents after jury selection has completed is a discovery dump. Whether it's reversible error is a different question. But it's a discovery dump. That many documents, I mean, with the continuance granted, that's 22,000 a day. That's 1,000 an hour. I haven't even gone. I don't have a calculator here, so I haven't even gone further. But that's an impossibility for a human being. If you think each defendant had three lawyers, it would be an impossibility while they are preparing for trial. So you and I can just disagree to disagree. Disagree on whether or not it was a discovery dump. This is not 5,000 documents. Your Honor, I don't think we actually disagree. I was simply trying to put it in context. Before trial, the government produced in discovery well over 3 million documents on time according to normal procedures. I was simply trying to explain the circumstances under which these PSD files were provided. We would not normally... The prosecutor made very clear in discussing this with the court, I will generally say we wouldn't do this because someone's entire email box is likely to be a lot of things in there that are completely irrelevant to the trial. But since the defense is requesting the full PSDs, we will endeavor to send the raw PSD files to the defendants this evening. So many of these documents, most of these documents were not discoverable. They were extraneous to the case. Five of the email boxes were from non-witness custodians. Had you reviewed the documents? Had you, the government, reviewed the documents? We reviewed them immediately after informing the defendants. You reviewed all 44,000? Yes, because they were... You told the district court you had... How did you do that? Because they were uploaded in processed form onto the database and they were word searchable. And so, and this is more context... You didn't search. You didn't review the documents. You performed a word search to see if there were targeted items that would pop up on the search. But you didn't go through a document-by-document review of the 44,000, right? I believe that's correct. We didn't talk with word searchers. And Ms. Weil says that it's clear from the record that the government didn't review those for any exculpatory brain-type information. That's not true, Your Honor. Okay, tell me where in the record I can find a representation by the government that it reviewed those 44,000 documents for exculpatory information. It's two pieces of the record, actually, Your Honor. At 5.55 p.m. on Wednesday, March 15th, the court directed the government to, quote, continue searching for potential Brady material and provide the defense the specific location of any potential Brady material in an ongoing and expedited manner. 5.55 p.m., Wednesday, March 15th. In response, government counsel began going through those documents, and in the emails that we have provided as a supplement to our filing, the government then, in fact, said, per the court's order, that's a direct quote referring back to the court's order to search for potential Brady, the government said, per the court's order, I'm attaching potentially relevant documents. When did the prosecutor do that? On Thursday, March 16th, and Friday, March 17th. A day later and two days later after the court's order? The next day, starting the next day, there were three separate identifications of potentially relevant Brady material. A morning, afternoon, evening, and then a final one on Friday morning. This was in direct response to the court's request to look. I know the court asked for that. I am really having trouble wrapping my head about the physical ability of human beings to conduct that sort of review within two days. I mean, it's the same number. That's 1,000 documents per hour. Who did that? I think I've specified, Your Honor, that the mechanism that the government used to quickly go through this, which is the same mechanism that the defense was using, because they too uploaded these documents into their word searchable platform. Yeah, but they might have searched for other information that you didn't. Like, what were the... I know you don't know word by word, but like, your searches for exculpatory information may or may not have yielded everything, unless you're reviewing the documents one by one. A document may have innocuous words and be exculpatory, so you can't search it and find it unless you review the document as a whole. The prosecutors are very familiar with the facts of the case. They know what words are likely to bring up information. And again, these documents, it's really important to emphasize, Your Honor, these documents are in themselves in a category that is unlikely to yield anything of relevance. As the prosecutor said at the time, these were five... You say that now, but at the moment in time that this is happening, that's impossible for a defense lawyer to know. Categorically, however, these were non-witness government custodians who had no connection to the facts of the case. These were custodians who had had a relation to one of the predecessor contracts that was not at issue in the case. So again, there was very little chance that any of these documents had any relevance, much less Brady relevance. The reason the government was going through was because it was trying to make sure that it did everything possible to assist the defense in its decision to try to go through all of these things. This was an effort to try to cure the prejudice, any potential prejudice, from the government's admitted mistake. Now, the focus, of course, has to be on the district court's handling of this. The question on appeal is, did the district court abuse its discretion in failing to grant dismissal as the remedy for the admitted late disclosure? And the answer to that is no. The district court looked at the factors that make that determination, and it found that the error was unintentional. It found no bad faith. That view was readily permissible. The documents were, as I've described, overwhelmingly extraneous. Great product. 33 non-substantive emails sent to Gannon's military account in 2018, 2019, long after the events in question. The PDFs that the defense counsel itself admitted were, quote, not relevant to the instant case here. That's document 323 at 81, 121, 122. And the court, most importantly, cured any potential prejudice with the remedies that it created. It asked the defense, how much time do you need? They said, give us until tomorrow. We don't really know what's here, but give us till tomorrow. So the court recessed through Wednesday. On Wednesday, the defendants reported back that they had a plan that could get us back into court and back into trial within this period, and that giving them one more day, so asking that the trial begin on Friday, quote, reflects a fair balancing of competing interests. That is the defense telling your honor they thought this amount of time was reasonable. The district court also granted a delay in the opening statements. The district court granted postponement of the crosses of Gannon, Coslerich, Hadrick, and Coleman until Monday of the following week, and gave the defendants the option to delay even the start of those witnesses' direct examinations. And as things played out, your honor, the witnesses in question were not directed or crossed until the following week. The four witnesses in question weren't crossed until between six and nine days after the production. And as some of the other questions have suggested, there has been no identification of any actual prejudice resulting from the late production. The defendants, in fact, used some of the newly produced documents at trial as exhibits, D2-300, D3-432, to quote, formulate and conduct cross examinations. They used some of the documents in crossing Coleman during, about the Cook emails, and to refresh recollections. More importantly, the government itself did not introduce any of these documents. This is not a situation where we had some information that was helpful, we didn't turn it over to the last minute, and then we used it. None of these documents were presented in our case in chief. What about the, there's one specific contention about actual prejudice with regard to documents, and that is the theory that because Gannon and Koch had a romantic affair, the defense could have built a so-called alternative theory that Coach Koch directed the contracts to go to the company where his girlfriend worked, which were reasons different and wholly unrelated to what the defendants had done. They, in fact, did cross Gannon about that, and there has been, they have pointed to no document at all, not a single one that could have further advanced the cross-examination that they actually performed. In their original claim, neither Hayes nor Flores identified a single document that they claimed could have assisted their defense. Carson initially identified these six emails from Gannon's Invistacom.com account and claimed those were the smoking guns, those were the ones that would have turned the entire tide of the case. And as her letter from earlier this week demonstrated, she has now withdrawn that claim because those documents were in the defendant's possession long before in trial. In fact, we had produced those to the defense in eight months before trial. So there is not a single document that has been identified to establish any sort of prejudice, actual prejudice, from the late production. If there are no further questions as to the late production, I would plan to turn to the statute of limitations. I do want to get to the sentencing claims as well. Go right ahead. Thank you, Your Honor. We agree with the observation that paragraph five in the tolling agreement is for the support for the tolling. But the elements of the tolling, its paragraph itself that our opponents have focused on, broadly encompasses the conspiracy charge here. The tolling applied to the investigation that the grand jury was conducting into, quote, possible criminal antitrust and related violations of federal laws with respect to United States government contracting. The conspiracy count alleged the defendants had coordinated in preparing ICGEs and coordinated in preparing and procuring purported competitive quotes to ensure the sole source awards for IntelliPeak. As the district court found and the defendants acknowledge, this collusion was a subject act because it was related. When I say the defendants acknowledge, they acknowledge that the tolling agreement applies if the charge was a subject act. Here, the subject act was related because it was related to the possible criminal antitrust violations with respect to government contracting that the grand jury was investigating. The defendant's argument essentially reads the words and related out of the contract. And related is a very broad term. These were, what was being investigated was federal violations with respect to government contracting and the conduct at issue related to the competitive process. The defendants were putting together sham quotes to make it look as if the prices were competitive. That is well within the standard accepted definition of antitrust or related violations. I'd like to quickly turn, if there are no further questions on that, to our sentencing claims. We're happy to rest on our brief as to the aggravating role. We think binding circuit precedent establishes the correctness of that claim. I would simply note that the error in failing to give a four-level enhancement rather than a three-level enhancement as to both Carson and Hayes does in itself require a remand for resentencing. The result of that error was a district court incorrectly calculated just on the basis of aggravating role the guidelines range for both of these defendants. It calculated the guidelines range as to Carson as four to 10 months. With the correct aggravating role it would have been six to 12 months. And with respect to Hayes, it calculated the guidelines range as zero to six months. With the correct enhancement it would have been four to 10 months. Defendants have not claimed harmless error. And of course, under Melina Martinez, a sentence based on an incorrectly calculated guidelines range almost conclusively establishes prejudice. But did the court sentence within the range that you think is correct with the proper aggravating role enhancement? It did, but that does not under Melina Martinez make any difference. Well, it's not a... You're right that it comes close to saying that, but it's not an absolute rule. I mean... Melina Martinez says, while a sentence that is ultimately within the range of the correctly calculated guidelines may indicate harmless error, where the record is silent as to what the district court might have done had it considered the correct guidelines range, the court's reliance on an incorrect guidelines range in most instances will suffice to show an effect on the defendant's substantial rights. Here, it's the government's substantial rights. And again, the defendants have even attempted to argue, and therefore it forfeited any claim of harmlessness. If I could... I've got four minutes left. I'd like to quickly address the fraud loss and restitution claim. Although the district court correctly recognized that the $7.8 million that the government paid under the contracts should be the starting point for calculating the government's loss, the district court legally erred in offsetting that amount to zero. Well, how do you even begin figuring out loss amount in a case where the government got, I don't want to say the benefit of the bargain because we have the issue with the price, right? But got the product, right? There's no dispute about that. The government says it paid an... probably paid an inflated price for the product, but it got the product. This is not a scam transaction where the government is completely deprived of anything. Correct. Correct. OK. So how do you begin even assessing at the front end before we get to your issue? How do you begin assessing loss in that sort of a scenario? Why is the loss 7.8, the beginning point 7.8? Let's say the government undisputably got 5 million dollars worth of product and 5 million dollars was the going market rate. Right? Those are assumptions I want you to make. I'm happy. If that's the case, why don't you start at 2.8 million? With loss, I mean, loss is loss. Yes, Your Honor. I have an answer to that question. It's, it is, these contracts never would have been awarded, but for the fraud. They were, and you got product in exchange. The way that that product in exchange factor is worked into the calculus is through the offset provision, the credits against loss. And that is where the district court here erred is in its understanding of credits against loss. I see I have two minutes. The proper offset is the fair market value. Here, the government presented detailed evidence supporting two different methods of calculating the fair market value. Under the first, the loss amount would have been 3.6 million. Under the second, it would have been, sorry, the offset would have been 4.2 million. Under the second, it would have been 4.9 million. But rather than examine the fair market value and the government's evidence supporting the fair market value, the district court felt itself bound by Byzantis to hold that fair market value was the full contract price based solely on the fact that the contract, contracts were performed. But Byzantis does not support that proposition. In Byzantis, the defendants, after having won a competitively bid CDC contract as the low bidder, provided weekly reports falsely certifying that they were properly treating their workers as employees. The court held that the government had proved no loss because it would have paid the same amount even if it had known of the fraud. These payroll records, the government simply would have stopped paying until the defendants properly categorized their workers and then would have paid. So there was no actual loss. And in an alternative holding, the court held that any offset would have to be the full contract value because, quote, the government did not contend that CDC didn't receive the full bargain for benefit. Because these were sole source set aside contracts, the bargain that the government had, the benefit the government had bargained for was to receive work from legitimate, qualified 8A contractors who had received the contracts fairly. Here, the profits, the government had intended profits to go to 8A contractors. Here, that didn't happen. So Byzantium says nothing about the government benefits situation. It simply addresses a competitive situation, which is not one we have here. And under Maxwell and Nagel, a correct calculation of actual fair market value would have been something along the lines of what we suggested below either the defendant's costs or the defendant's costs plus some amount of profit. But in either calculation, the government paid way more than the fair market value and the district court should have the opportunity to make that determination on remand. For those reasons... Thank you very much. We would ask that you affirm the convictions, vacate the sentences, and remand for resentencing. All right, thank you. Thank you, Your Honor. Oh, before you sit down, where do we stand with regards to the company? Yes, Your Honor. The restitution issue and the bankruptcy? Yes, Your Honor. On Friday, on May 15th, the trustee filed a request for a final decree. Objections are due June 14th. If the objections are filed, there'll be a hearing on the 25th. So the final decree has not yet come in. We'll notify the court once it does. If it goes in, then the restitution issue is gone? If it goes in, our appeal as to Invistacon will be moved. Right, okay. Thank you. Thank you, sir. Your Honors, with respect to the discovery dump issue, first, Mr. Strand said the documents were not discoverable. That's not right. The government's agreed that it was Rule 16 discovery. They agreed to that below. They were described as being irrelevant. And some of the documents we even were able to use. So obviously, they were relevant. We used them to cross-examine. Second, the judge asked for a Brady review on that Wednesday at 5.55 p.m. The email that was sent back that said, per the court's order, that's all it said. It said, attach your potentially relevant documents. Didn't say we did a Brady review of everything. Didn't say we reviewed all 44,000 documents. Didn't say that there isn't any Brady in there. We also, with respect to the search terms, you're correct. Our search terms could have been completely different than their search terms. We asked for the agent's search terms. We were told either, I can't remember if they weren't available. We weren't given them. They either weren't available, we don't know, or whatever. We weren't given the agent's search terms. And we never got the prosecutor's search terms. So we don't know what they were searching for. We do know that of the documents, unlike what the prosecution says, we don't know, first of all, what was in it. But we do know that an impeachment was in it. This was Cook's file. COCH, Cook. Lieutenant Colonel Cook was having an affair, we found out, apparently the day before, that's when the government said they found out, that he was having an affair with the star witness. Cook was the end user. He was the one who set this whole thing in motion to have the contracts. Gannon, he's having an affair with, worked for Invistacom. He got it so that he within the government and all of the army and the military said, Invistacom's going to get this. It's a bridge contract. We need this. We have a war in Afghanistan. We've got goods and services. We want them to do this. So they knew that that was it. They were going to get the contract. It was Ed Dove who said, do this for me. So they did it for him, which was business as usual, as is in the email that we produced that apparently had been turned over in the three million documents originally. There was stuff going on between the government contractor and the government. Maybe Ed Dove thought at the time it was fine. There are these weird regulations that are far regulations that say, well, sometimes, you know, you can talk to government contractors. But prior to a contract being entered, they can help you with stuff. He took it too far, according to the government. And Mr. Carson was prosecuted. Interestingly, Ed Dove was not. But Mr. Carson was prosecuted because of these interactions, because of the fact that these cost estimates were created by people who worked at Invistacom. But that was part of the defense that we tried to create. They would not give us the investigative file to find out what the relationship actually was between Cook and Gannon, because if Cook was trying to push this over to Gannon, trying to get guilt away from himself and the affair was relevant, we didn't know enough to cross-examine her about it. I believe, and I can look again, there was nothing about the affair in the record. Or at least I can certainly say nothing about what the consequence of the affair in the investigation and how it resulted and what the relationship actually was. But we did get a little bit into evidence about this business as usual, where the government contractor provides information to the government. And I believe my time is over. You can wrap up. What I would just wrap up is that when there's a conversation about bad faith, what we maybe didn't make clear enough on our brief, and maybe the government has not looked at it this way, but when the argument, the evidence was that the agent said she uploaded the documents and the prosecutor said, well, it must have been a problem because in the download. If there was a problem in the download by the prosecutor, that meant that the government, the prosecutor knew there was something up there that was being downloaded, should have been turned over. If he knew, he should have at least checked to see if it was sent over and put into the USAFX for the defense to get. So bad faith? I don't know.  Absolutely. All right. Thank you, Your Honor. Thank you. Nothing further. Absent questions from the panel. I think we're done then. Thank you. Thank you both. Thank you all very much. We appreciate it. I'm sorry. I forgot to thank you very much for letting me do this argument today. No problem at all. Glad to be able to do it.  Don't be shy. Come on up. Take your time. Take your time setting up. I'll go ahead and call the next case.